**In the Matter of the Application of the UNITED STATES SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS.**

**Appeal of William CAMMISANO.**

Nos. 80–2382 & 81–1037.

United States Court of Appeals, District of Columbia Circuit.

Argued March 27, 1981.

Decided May 13, 1981.

---

Bruce C. Houdek, Kansas City, Mo., for appellant.

Charles Tiefer, Asst. Senate Legal Counsel, Washington, D. C., with whom Michael Davidson, Senate Legal Counsel, Washington, D. C., was on the brief, for appellee.

Before WRIGHT and WILKEY, Circuit Judges, and CORCORAN,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

The appellant, William Camisano, who is currently serving a prison sentence for extortion, was summoned to testify about organized crime before a Senate subcommittee. After he refused to testify despite a grant of immunity, the District Court cited him for civil contempt and imposed a sentence. In this appeal Cammisano argues that the District Court erred in approving the grant of immunity and in sentencing him for civil contempt. Finding both the grant of immunity and the sentence for civil contempt to be proper, we affirm.

## I. FACTS

In early April 1980 the Senate Permanent Subcommittee on Investigations voted to hold hearings on mob violence and organized crime. As part of those hearings the Subcommittee sought to obtain the testimony of the appellant, who since January 3, 1979 has been serving a five-year sentence for violation of the Hobbs Act, 18 U.S.C. § 1951 (1976). Accordingly, the Subcommittee issued a subpoena to Cammisano and directed the Senate Legal Counsel to obtain a court order granting Cammisano immunity for testimony to be given before the Subcommittee.[1] Thereafter, on April 10, the Senate Legal Counsel notified the Attorney General of the Subcommittee's in-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The resolution so directing Senate Legal Counsel is reprinted at Joint Appendix (JA) 14–15.

tention to seek such a court order.[2] And five days later, on April 15, the Department of Justice informed[3] Senate Legal Counsel that it had no objection to such a court order and that it was waiving the 10-day notice requirement of 18 U.S.C. § 6005(b)(3) (1976), under which at least 10 days must elapse between the time the Attorney General is notified of a committee's intention to obtain such an order and the time the request is actually made. On April 18 Senate Legal Counsel formally applied to the District Court for an order of immunity for Cammisano, an order which the court issued that day.[4]

Cammisano appeared before the Subcommittee on May 1, 1980. He refused, however, to answer any questions other than preliminary ones, such as regarding his name, current address, and criminal record.[5] He repeatedly stated that his refusal to answer questions was based on his rights under the Constitution and the terms of his plea bargain agreement.[6] Following Cammisano's refusal to answer the series of questions, the Subcommittee informed him of the District Court's immunity order, under which Cammisano was granted "use" immunity[7] and directed not to refuse to answer any questions on the basis of his right against self-incrimination. Cammisano nevertheless continued to refuse to answer any questions, giving the same objections.

In view of Cammisano's recalcitrance the full Senate, upon the recommendation of the Committee on Govermental Operations,[8] activated the civil enforcement regime established under Section 705 of the Ethics in Government Act of 1978, 2 U.S.C. § 288d (Supp. III 1979), 28 U.S.C. § 1364 (Supp. II 1978). By resolution the full Senate directed Senate Legal Counsel to "bring a civil action * * * to enforce the subcommittee's subpena to William Cammisano * * *."[9] Thereupon, Senate Legal Counsel applied to the District Court for the District of Columbia for an order enforcing the subpoena. Over Cammisano's objections the District

2. Notice of Intention to Request Orders Conferring Immunity, from Michael Davidson, Senate Legal Counsel, to Attorney General (April 10, 1980), *reprinted at* JA 17.

3. Letter from Philip B. Heymann, Assistant Attorney General, to Michael Davidson, Senate Legal Counsel (April 15, 1980), *reprinted at* JA 18.

4. The immunity order is reprinted at JA 19. Under its terms Cammisano was ordered "not [to] refuse to appear and testify before the * * Subcommittee * * * on the basis of his privilege against self-incrimination * * *." Additionally, it provided "that no testimony compelled under th[e] Order (or any information directly or indirectly derived from such testimony) may be used against William Cammisano in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with th[e] Order." Thus, while referred to as an order of immunity, the order not only granted Cammisano immunity, but also compelled his testimony.

5. *See Organized Crime and Use of Violence, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 96th Cong., 2d Sess. 224–233 (1980) (testimony of William Cammisano).

6. He repeatedly stated:

> I refuse to answer, based on my rights under the U.S. Constitution, including my rights not to incriminate myself, right of privacy, my right to due process of law, equal protection of law, and the plea bargain agreement in my case.

*Id.* at 228 *passim.*

7. Such immunity is to be contrasted with "transaction" immunity:

> Transaction immunity may be simply described as that which precludes prosecution for any transaction or affair about which a witness testifies. Use immunity, by contrast, is a grant with limitations. Rather than barring a subsequent related prosecution, it acts only to suppress, in any such prosecution, the witness' testimony and evidence derived directly or indirectly from that testimony. Evidence obtained wholly independently of immunized testimony may serve as a basis for prosecuting the witness for activities and transactions including those covered in his own statements.

*Application of U. S. Senate Select Committee on Presidential Campaign Activities,* 361 F.Supp. 1270, 1274 (D.D.C.1973).

8. This is the parent committee of the Permanent Subcommittee on Investigations.

9. S. Res. 502, 96th Cong., 2d Sess. (1980), *reprinted at* JA 78.

Court, on October 24, 1980, granted the application and ordered Cammisano to answer the questions of the Subcommittee.[10]

In early December 1980 the Subcommittee accordingly gave Cammisano notice that he would again be called to testify about organized crime. Two days after Cammisano received notice, however, he signed a stipulation with the Subcommittee, providing that if he "appeared before the Subcommittee * * * he would respectfully refuse to answer"[11] its questions. Having been frustrated again in its effort to obtain the testimony of Cammisano, the Subcommittee, through Senate Legal Counsel, returned to the District Court and moved that it enter, pursuant to Section 705(f)(1) of the Ethics in Government Act, 28 U.S.C. § 1364 (Supp. II 1978), an order holding Cammisano in civil contempt. Over the objections of Cammisano the District Court, on December 29, 1980, held him in contempt and ordered that he be incarcerated until he answered the questions of the Subcommittee.[12] The order stated, however, that the period of incarceration "shall not exceed the period in which the Subcommittee continues to certify an interest in the testimony of Cammisano, and shall end at the adjournment of the 97th Congress."[13]

From this order, and the District Court's earlier order of October 24, 1980,[14] Cammisano appeals to this court, challenging both the validity of the grant of immunity and the lawfulness of the civil contempt sentence.

## II. THE IMMUNITY ORDER

The District Court issued its immunity order, under which Cammisano was granted use immunity and compelled to answer the Subcommittee's questions, pursuant to its authority under Sections 6002 and 6005 of Title 18.[15] Relying on two technical objections, Cammisano argues that the immunity order was invalid under the terms of Section 6005 and that he was accordingly not required to answer the legitimate questions of the Subcommittee.

■ Cammisano's first argument is that the 10-day notice requirement contained in Section 6005(b)(3) was not satisfied. This subsection reads:

(b) Before issuing an order under subsection (a) of this section, a United States district court shall find that—

\* \* \* \* \* \*

10. *Senate Permanent Subcommittee on Investigations v. Cammisano*, Misc. No. 80–0102 (D.D.C. Oct. 24, 1980), *reprinted at* JA 184.

11. Stipulation Concerning Appearance Before Subcommittee, Stays and Sanctions Pending Appeal, *Senate Permanent Subcommittee on Investigations v. Cammisano*, Misc. No. 80–0102 (D.D.C. Dec. 2, 1980), at 1–2, *reprinted at* JA 212–213.

12. *Senate Permanent Subcommittee on Investigations v. Cammisano*, Misc. No. 80–0102 (D.D.C. Dec. 29, 1980), *reprinted at* JA 268.

13. *Id.* at 1, JA 268. The order additionally stayed the beginning of Cammisano's incarceration until 20 days after the issuance of the mandate of this court in this appeal.

14. Cammisano filed separate appeals from the two orders, but the two appeals were consolidated.

15. 18 U.S.C. § 6005 (1976) authorizes District Courts to issue an order compelling an individual "who has been or may be called to testify or provide other information" before either

House of Congress, or committee or subcommittee thereof, "to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination * * *." And under 18 U.S.C. § 6002 (1976), whenever the individual "refuses, on the basis of his privilege against self-incrimination, to testify or provide other information * * * and the person presiding over the proceeding" informs him of the order issued under § 6005, the individual is granted use immunity, *see* note 7 *supra*, and "may not refuse to comply with the order on the basis of his privilege against self-incrimination * * *."

In *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972), the Supreme Court held that § 6002's grant of use immunity "is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." Accordingly, no argument is made in this case that § 6002 violates the Fifth Amendment on the ground that the witness, whose testimony is compelled, is only granted use immunity rather than the broader transaction immunity, *see* note 7 *supra*.

(3) ten days or more prior to the day on which the request for such an order was made, the Attorney General was served with notice of an intention to request the order.

In the instant case the Department of Justice waived the 10-day notice requirement. Thereupon, only eight days after having notified the Attorney General of his intent to apply to the District Court for an immunity order, Senate Legal Counsel formally made such application. Cammisano argues that the 10-day notice requirement is mandatory, leaving the Department of Justice no discretion to waive it, and that the immunity order was consequently invalid under Section 6005(b)(3).

We must reject Cammisano's narrow interpretation of the notice requirement. The legislative history of Section 6005(b)(3) reflects two purposes behind the 10-day notice requirement.[16] First, a 10-day notice period provides the Department of Justice with "time to 'lobby' for a change of mind"[17] on the part of the congressional committee should the Attorney General object to the grant of immunity. Second, the notice period gives the Attorney General "an opportunity to insulate from the immunity grant any incriminating data already in his files prior to the witness' testimony."[18] As is evident from these twin aims,

the 10-day notice requirement was plainly intended to benefit *solely* the Department of Justice. And in view of that intent, it would be anomalous to hold that the notice requirement cannot be waived by the Department, its sole intended beneficiary, but must instead be administered in a manner antithetical to the interests of the Department. We decline to adopt such a bizarre rendering of Section 6005(b)(3). Instead we interpret the section consonant with congressional intent and common sense, and hold that the Department may waive the 10-day notice requirement.[19]

■ In challenging the District Court's immunity order, Cammisano secondly argues that the court improperly issued the order prior to his refusal to answer questions before the Subcommittee. Under Section 6005, Cammisano contends, the District Court may issue immunity orders "only after the witness 'refuses'" to answer questions.[20] Cammisano's contention is undercut, however, by the language of Section 6005(a):

In the case of any *individual who* has been or *may be called to testify* or provide other information at any proceeding before either House of Congress, or any committee, or any subcommittee of either House, or any joint committee of the two

---

16. Section 6005 was modeled after a draft provision recommended by the National Commission on the Reform of Federal Criminal Laws, which was appointed by Congress in 1966 to study and recommend improvements in the federal criminal laws. *See Measures Relating to Organized Crime, Hearings on S. 30, S. 974, S. 975, S. 976, S. 1623, S. 1624, S. 1861, S. 2022, S. 2122, and S. 2292 Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary*, 91st Cong., 1st Sess. 292 (1969) (draft provision § 4). The enacted version contained no substantive differences from the draft provision. Moreover, the sponsors of the companion bills in the House and Senate containing what is now § 6005 were all members of the National Commission on the Reform of Federal Criminal Laws. *See* S.Rep.No.617, 91st Cong., 1st Sess. 55 (1969). Accordingly, in determining the legislative intent behind § 6005(b)(3) we place great emphasis on the discussion of the model provision in the Commission's Working Papers. We are not the first court to place such reliance on those Papers. *See Application of U.S. Sen-*

*ate Select Committee on Presidential Campaign Activities, supra* note 7, 361 F.Supp. at 1275.

17. II Working Papers, National Commission on Reform of Federal Criminal Laws 1406 (1970); *see id.* at 1442; *Application of U.S. Senate Select Committee on Presidential Campaign Activities, supra* note 7, 361 F.Supp. at 1277.

18. II Working Papers, *supra* note 17, at 1406; *see Application of U.S. Senate Select Committee on Presidential Campaign Activities, supra* note 7, 361 F.Supp. at 1277.

19. This case is not the first instance in which the District Court for the District of Columbia has issued an immunity order under § 6005 after the Government has waived the notice requirement. *See Application of U.S. Senate Select Committee on Presidential Campaign Activities*, 361 F.Supp. 1282 (D.D.C.1973).

20. Brief for appellant at 14.

Houses, a United States district court shall issue, in accordance with subsection (b) of this section, upon the request of a duly authorized representative of the House of Congress or the committee concerned, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(Emphasis added.) By its very terms the section permits District Courts to issue an immunity order before the witness has appeared before the congressional body—*i. e.*, "[i]n the case of any individual who * * * may be called to testify * * *."

Cammisano reads Section 6005(a) to the contrary, relying on the language in the section describing the order to be issued as one "requiring such individual to give testimony or provide other information which he *refuses* to give or provide on the basis of his privilege against self-incrimination * * *." (Emphasis added.) But Cammisano is mistaken in construing this language as prohib-

iting courts from issuing an immunity order prior to the witness' refusal to answer questions. Rather, the language relied on simply means that an immunity order issued under Section 6005 is not effective until the witness refuses to answer questions, although the District Court may have issued the order prior to the witness' appearance.[21]

Any remaining doubt that Section 6005 permits preappearance issuances of immunity orders is dispelled by the legislative history of the section.[22] In testimony before a House subcommittee the Deputy Director of the Federal Commission that drafted the model provision from which Section 6005 originated [23] stated that the language now contained in Section 6005(a) permits issuance of an immunity order "in advance of the witness' actually appearing under oath and being asked a question." [24] The benefit to be derived from permitting advance orders is obvious. As the Deputy Director pointed out, "[A]n advance order will permit, in those cases where the witness is willing to answer if he is granted immunity, the procedure to go forward

---

21. Indeed, this was the timing of events in the instant case. The District Court issued the immunity order on April 18, 1980, prior to Cammisano's appearance before the Subcommittee on May 1, 1980. The order did not become effective, however, until it was read to Cammisano on May 1, after he refused to answer legitimate questions of the Subcommittee.

22. Our reading of the section is also buttressed by the holdings of other courts permitting prospective immunity orders under § 6003, which deals with grand jury and court witnesses. *See United States v. Leyva*, 513 F.2d 774, 776 (5th Cir. 1975); *In re Weir*, 520 F.2d 662, 665 (9th Cir. 1975). Significantly, § 6003(a) contains the same language contained in § 6005(a) on which Cammisano relies for his contention that prospective orders are precluded. While Cammisano concedes that prospective orders are authorized under § 6003 as well as under § 6004, which deals with witnesses in administrative proceedings, he distinguishes these two sections from § 6005 on the basis that §§ 6003 and 6004 "contain specific language which authorizes a pre-appearance grant of immunity * * * to an 'individual who has refused or is likely to refuse to testify * * *.'" Brief for appellant at 11 (*quoting* §§ 6003(b) and 6004(b)) (last ellipsis in original). Contrary to the claim of Cammisano, it is not the additional

language in §§ 6003(b) and 6004(b) that authorizes prospective immunity orders under §§ 6003 and 6004. The additional language Cammisano cites *limits* the grant of immunity orders to certain situations; it does *not authorize* prospective immunity orders. For example, under § 6004(b) an administrative agency may issue an immunity order

· *only if* in its judgment—

 (1) the testimony * * * may be necessary to the public interest; and

 (2) such individual has refused or is likely to refuse to testify * * *.

(Emphasis added.) The authority for prospective grants under §§ 6003 and 6004 is instead found in the language of §§ 6003(a) and 6004(a), authorizing orders "[i]n the case of any individual who * * * may be called to testify," language identical to that contained in § 6005(a). *See In re Weir, supra*, 520 F.2d at 665 ("Prospective grants of immunity appear to be contemplated by 18 U.S.C. § 6003(a) * *.").

23. *See* note 16 *supra*.

24. *Federal Immunity of Witnesses Act, Hearings on H.R. 11157 and H.R. 12041 Before Subcommittee No. 3 of the House Committee on the Judiciary*, 91st Cong., 1st Sess. 70 (1969).

without having to convene twice the body before whom he is testifying." [25]

### III. THE CIVIL CONTEMPT SENTENCE

Having failed to obtain the testimony of the appellant despite a grant of immunity, the Senate Subcommittee proceeded to seek enforcement of its subpoena through the civil contempt mechanism of Section 705 of the Ethics in Government Act of 1978, 2 U.S.C. § 288(d) (Supp. III 1979), 28 U.S.C. § 1364 (Supp. II 1978). This was the first attempt to do so under the newly enacted law. Prior to 1978 Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism [26] and the inherent congressional contempt power.[27] Neither means, however, permitted a witness to challenge judicially "the legality of the inquiry or procedures, and then to purge himself of his contempt by testifying if his contentions were not judicially upheld * * *." *United States v. Fort,* 443 F.2d 670, 677 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971). Responding to this deficiency, Congress enacted the mechanism for civil enforcement of Senate subpoenas contained in the Ethics in Government Act of 1978.[28] This new civil enforcement mechanism, employed in this case, is relatively simple. If an individual refuses, or threatens to refuse, to comply with a Senate subpoena, the Senate may request a court order requiring the individual to comply with the subpoena. If the individual continues to disobey the court order, the District Court is directed to initiate a civil contempt proceeding before the court.

■ Cammisano advances three arguments for reversing the order of the District Court holding him in civil contempt. His first argument is that the action of the District Court violated his 1978 plea bargain agreement. The relevant portion of the plea bargain agreement, as it was stated by the prosecutor, provided:

[T]he government has agreed or has noted that the defendant has expressed his concern about further indictments that the government may be contemplating or planning. The government will represent as part of this deal or agreement that it has no knowledge of any other investigations of the defendant and, therefore, has no intention of recommending any indictment upon facts presently within the knowledge of the government, that is indictment of defendant William Cammisano.[29]

Cammisano argues that "his incarceration for contempt certainly constitutes prosecution and punishment for matters within the

25. *Id.*

26. 2 U.S.C. §§ 192, 194 (1976). The criminal contempt statute provides that recalcitrant congressional witnesses may be convicted of a "misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months." *Id.* § 192. Unlike the civil contempt mechanism of the Ethics in Government Act of 1978, the sentence imposed under the criminal contempt statute is punitive rather than coercive in nature.

27. Prior to enactment of the criminal contempt mechanism in 1857, this provided the only procedure for enforcing compliance with congressional subpoenas.

Under this procedure, the witness who refused to testify was committed to the Sergeant-at-Arms of the respective House until he was willing to "purge" himself of his contempt by supplying the requested information, but his confinement could not extend beyond the term of the session, and could always be challenged by habeas corpus.

*United States v. Fort,* 443 F.2d 670, 676 (D.C. Cir.1979), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971) (footnotes omitted).

28. The Act does not, however, include civil enforcement of subpoenas by the House of Representatives. *See* H.R.Rep.No.95–1756, 95th Cong., 2d Sess. 80 (1978) (Conference Report) (noting that appropriate House committees had not yet considered a "proposal to confer jurisdiction on the courts to enforce" House subpoenas).

29. JA 130 (transcript of proceedings on October 23, 1978 in *United States v. Cammisano,* 433 F.Supp. 964 (W.D.Mo.)).

knowledge of the Justice Department at the time he entered his plea." [30]

We are unpersuaded by Cammisano's argument. The terms of the plea bargain agreement plainly do not preclude the Government—in this case the Senate—from seeking to secure the testimony of Cammisano.[31] Moreover, since the plea agreement only precludes *criminal indictments* of Cammisano based on facts then known to the Government, a proceeding and sentence for *civil* contempt would be outside the scope of the agreement.

■ Cammisano's second argument concerning the contempt sentence is that the District Court, by ordering his incarceration for civil contempt to interrupt the sentence he is currently serving for extortion, violated several provisions of law and abused its discretion. Cammisano's argument is foreclosed, however, by this court's *en banc* decision in *United States v. Liddy*, 510 F.2d 669 (D.C.Cir.1974), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975). In *Liddy* this court held it lawful for a civil contempt sentence to interrupt a criminal

sentence previously imposed.[32] Moreover, seven other circuits [33] have adopted a rule permitting civil contempt sentences to interrupt criminal sentences, and "no circuit which has addressed the issue has held otherwise." [34]

■ Cammisano's final argument is that the civil enforcement mechanism enacted as part of the Ethics in Government Act of 1978 violates the constitutional guarantees of due process and equal protection and permits cruel and unusual punishment, since it "permits the indefinite incarceration of Mr. Cammisano and others proceeded against in similar circumstances for so long as the Senate, its committee or subcommittee certifies a continuing interest in the information." [35] Unfortunately, Cammisano's argument is not properly presented at this juncture, since he does not face unending incarceration. The Subcommittee has only certified continuing interest in his testimony through the end of the 97th Congress,[36] and the District Court held that Cammisano's incarceration under the order here challenged "shall not exceed the period

---

**30.** Brief for appellant at 19. He also vaguely suggests that the grant of immunity violated the terms of the agreement. We reject this claim for the same reasons that we subsequently give for rejecting his argument that the contempt proceeding and incarceration were precluded by the terms of the agreement.

**31.** *See also Piemonte v. United States*, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961) (approving criminal contempt sentence for individual who refused to testify before a grand jury about a crime for which he was previously convicted and other criminal transactions).

**32.** The court rejected the very contentions that Cammisano makes in this appeal: that interruption of the criminal sentence violates Fed.R. Crim.P. 35, 18 U.S.C. § 3568 (1976), and the Double Jeopardy Clause of the Fifth Amendment.

**33.** *United States v. Dien*, 598 F.2d 743 (2d Cir. 1979) (*per curiam*); *In re Garmon*, 572 F.2d 1373, 1375–1376 (9th Cir. 1978); *Bruno v. Greenlee*, 569 F.2d 775 (2d Cir. 1978) (*per curiam*); *In re Grand Jury Investigation (Appeal of Hartzell)*, 542 F.2d 166, 168–169 (3d Cir. 1976), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977); *In re Grand Jury Proceedings (United States v. Marshall)*, 532 F.2d 410, 411–412 (5th Cir.) (*per curiam*), *cert. de-*

nied, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976); *Martin v. United States*, 517 F.2d 906 (8th Cir.), *cert. denied*, 423 U.S. 856, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *Williamson v. Saxbe*, 513 F.2d 1309 (6th Cir. 1975) (*per curiam*); *Anglin v. Johnston*, 504 F.2d 1165 (7th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975).

**34.** *United States v. Dien, supra* note 33, 598 F.2d at 745.

**35.** Brief for appellant at 15–16. Presumably Cammisano takes objection to the following provision in the Act:

An action, contempt proceeding, or sanction brought or imposed pursuant to this section shall not abate upon adjournment sine die by the Senate at the end of a Congress if the Senate or the committee or subcommittee of the Senate which issued the subpena or order certifies to the court that it maintains its interest in securing the documents, answers, or testimony during such adjournment.

28 U.S.C. § 1364 (Supp. II 1978).

**36.** The Subcommittee so certified on June 25, 1980. *See* JA 233–234 (transcript of Executive Session of the Permanent Subcommittee on Investigations, June 25, 1980).

in which the Subcommittee continues to certify an interest in the testimony of Cammisano, and shall end at the adjournment of the 97th Congress." [37]

And even if Cammisano's attack on the constitutionality of the statute were properly presented at this time, we would be compelled to reject it. In *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), the Supreme Court recognized that recalcitrant grand jury witnesses may be incarcerated for civil contempt until the end of a grand jury inquiry, and that "the sentences of imprisonment may be continued or reimposed if the witnesses adhere to their refusal to testify before a successor grand jury." *Id.* at 371 n.8, 86 S.Ct. at 1536 n.8. We can see no distinction between that situation and the situation hypothesized by the appellant, where successive civil contempt sentences are imposed on a Senate witness who continues to refuse to answer legitimate questions and where the Senate, or committee or subcommittee thereof, continues to express interest in the witness' testimony.[38]

## IV. CONCLUSION

For the foregoing reasons, the orders of the District Court from which Cammisano appeals are

*Affirmed.*

---

**37.** *Senate Permanent Subcommittee on Investigations v. Cammisano,* Misc. No. 80–0102 (D.D.C. Dec. 29, 1980), *reprinted at JA 268.*

**38.** Of course, if Congress' interest in the witness' testimony continued for an unreasonable number of sessions, the principle of *Shillitani* might perhaps lose much of its force. But that is not the situation presently before us.